University Circle Development Foundation et, Plaintiffs-Appellants, *v.* Perk, Auditor of Cuyahoga County, Defendant-Appellee.

Ohio Appeals, Eighth District, Cuyahoga County.

No. 26863.   Decided August 20, 1964.

*Messrs. Jones, Day, Cockley & Reavis, Mr. Victor DeMarco* and *Mr. Raymond J. Durn*, of counsel, for plaintiffs-appellants.
*Mr. John T. Corrigan*, prosecuting attorney, and *Mr. Thomas P. Cyrus*, assistant prosecuting attorney, for defendant-appellee.

Silbert, J.   This appeal comes to this court on questions of law from the decision of the Board of Tax Appeals of Ohio denying appellants' application for an exemption from real estate taxes for the year 1962.   Appellants herein are Univer-

sity Circle Development Foundation, University Hospitals of Cleveland, Case Institute of Technology, Western Reserve University, and Benjamin Rose Institute, all of which made applications to exempt twenty-two parcels of land from real estate taxes which parcels of land are used exclusively as parking areas for the above institutions.

The University Circle area is located just east of East 105th Street and Euclid Avenue in the City of Cleveland and encompasses some four hundred eighty-eight acres of land and is recognized as the cultural, educational, and medical hub of the Greater Cleveland area. Within this area are such eleemosynary institutions as Western Reserve University, Case Institute of Technology, University Hospitals, Benjamin Rose Institute, Cleveland Institute of Art, Cleveland Institute of Music and Severance Hall.

In 1956, the University Circle Planning Committee, composed of more than thirty civic leaders, decided to expand and encourage growth of this area notwithstanding the fact of its urban surroundings. A comprehensive plan that was adopted in 1957 considered parking as a serious problem requiring a solution in the development of the University Circle area.

In 1957, University Circle Development Foundation was organized as a non-profit charitable corporation, directed by a five member board of trustees, one member chosen by Western Reserve University, one by Case Institute of Technology, and one by University Hospitals, all of whom, in turn, elected two additional trustees nominated by other member charitable institutions, to implement this comprehensive plan. Its prime function was to acquire land for growth and expansion of its member institutions. Any land so acquired is restricted by deed to specific charitable purposes. The Foundation also has control of the central planning of all the institutions which is performed by the members of its staff. It also operates a fifteen man special police force for the area and acts as a medium for publicizing the institutions' cultural and educational activities.

At the outset the Foundation obtained separate $100,000 loans from Case, Western Reserve and University Hospitals and a grant of $2,000,000 from the Hanna Fund. Late in 1961, $6,000,000 was raised by public subscription.

In 1961, the traffic problem in the area had grown to such proportion that some fifteen thousand visitors, patients, and students and five thousand employees of the institutions had access to only four thousand one hundred seven parking spaces. University Hospitals alone, with its one thousand beds, had two thousand full-time employees along with a medical staff consisting of some eight hundred persons. The majority of parking spaces were temporary areas or surface areas interspersed throughout the University Circle area. The basic cause of the problem was that the available parking spaces were being taken by employees and students thereby excluding parking areas for visitors to the hospitals. Numerous complaints were received from patients and visitors. A survey taken by the Foundation showed that many persons had to traverse parking areas ten to twelve times before a space became available. At this time the institutions that are parties to this proceeding entered into an understanding with the Foundation to pool their separate limited parking facilities for the benefit of all. A report prepared by the Foundation concluded that parking fees would have to be charged in order to offset a portion of the increased costs incurred in providing and regulating the parking facilities and in so doing serious consideration was given to the ability of students and employees to pay such fees. Case, Western Reserve and University Hospitals each entered into a statement of understanding with the Foundation by which a parking advisory board was created composed of a representative from each institution. By this action, the Foundation took over the operation of the parking facilities through a comprehensive program of organizing and staffing the entire parking operation. Visitors were assigned to parking areas near the institutions. Each employee, faculty member, staff member and student was required to make application to obtain a parking permit. Upon issuance of same each was assigned to outlying parking areas. Western Reserve denied parking permits to any student who resided within walking distance of the campus. Students, faculty, staff members and employees were charged $11.00 per semester or $25.00 per calendar year for such privilege. Visitors were not charged if their stay was less than fifteen minutes. If their stay was longer, the parking charge

for the first hour was twenty-five cents, each additional hour fifteen cents, with a daily maximum of one dollar. Some visitors, such as special guests and volunteer workers, were issued courtesy tickets. It should be noted that in a survey taken, every visitor who answered a survey card was visiting one of the charitable institutions. The parking areas were controlled through the use of both attendants and electronic gate control equipment. The record discloses that there has been a substantial decrease in the number of monthly violations since the inception of this system.

The Foundation has, in an attempt to encourage the use of public transportation, established free shuttle bus service to and from the Rapid Transit and from the outlying parking areas to the principal institutions.

The expenditures for the operation of these parking facilities amounted to over $387,000 for the year of 1962. Out of this some $170,000 was attributable to salaries of twenty-two full-time and twenty-five part-time employees. The income derived was $276,514.20, therefore, giving rise to a $110,621.70 deficit. This, however, included capital expenditures such as parking gates, blacktopping, and other improvements that were not to be amortized. Suffice it to say that there was a substantial loss for the year of 1962, the deficit being made up by the Foundation. Over $1,000,000 has been spent by the Foundation on these parking facilities and projected plans are to build facilities underground or a multi-level structure because of the paucity of surface area available.

Appellants assign the following as error:

"1. The Board of Tax Appeals' Decision was unreasonable and unlawful in ruling that parking facilities used exclusively for the benefit of charitable institutions and located within the campus area as a part of such institutions are taxable merely because separate parking fees are charged.

"2. The Board of Tax Appeals committed prejudicial error in refusing to admit evidence of the critical need for parking facilities."

Section 2 of Article XII of the Ohio Constitution provides, in part, that "* * ** general laws may be passed to exempt * * * institutions used exclusively for charitable purposes * * *."
The implementation of this provision is embodied in Section

5709.12, Revised Code, which, in part, provides that "* * * Real and tangible personal property belonging to institutions that is used exclusively for charitable purposes shall be exempt from taxation."

In its entry the Board of Tax Appeals assumed that the Foundation was a charitable institution for the purposes of the case and acknowledged that the remaining appellants were charitable institutions.

The Board's entry, in part, said:
"* * *

"It therefore seems quite clear that neither in law nor in logic should we arbitrarily grant to charitable institutions the special consideration of exempting from taxation any of their real property which is used for off-street parking purposes and for which parking privileges a fee is charged. It is understandable that where a charitable institution provides 'free' parking accommodations to those using the services offered by such institutions, it may be stated, with reasonable justification, that the offering of such free-parking service is part of the charitable use. On the other hand, when such institutions charge for parking accommodations, where is the charity?
"* * *"

It would seem that the Board's decision was predicated solely on the separate fee charged for the use of the parking facilities.

The question therefore involved in this appeal is whether certain parcels of real estate owned and used by charitable institutions for parking facilities for students, faculty, staff members, employees, and visitors of such institutions for which a fee is charged to offset a portion of the increased costs incurred in providing and regulating the parking facilities is property "used exclusively for charitable purposes" within the meaning of Section 5709.12, Revised Code, and, therefore, entitled to be exempted from taxation.

Our first consideration is the case of *In re The Bond Hill-Roselawn Hebrew School*, 151 Ohio St., 70, 84 N. E. (2d), 270, wherein application was made to exempt real property under Section 5349, General Code (now Section 5709.07, Revised Code), which exempts houses "used exclusively for public worship"

from taxation. The house in question was a one and one-half story building, the first floor of which was used for worship and three rooms on the second floor were occupied by the caretaker and his family. The prime and principal use of the building being public worship, the court held that the house was "used exclusively for public worship" and, therefore, exempted from taxation. The court also held that "Although constitutional provisions for exemption from taxation should be given a strict construction, that construction should be reasonable and one which will not defeat the intention which the people expressed by the words which they used."

The record discloses that to adequately control the chaotic conditions that had developed and to properly operate parking for the institutions, the limited parking areas had to be utilized in the best possible manner, and new facilities had to be developed. To do this vast sums were expended. To offset some of these expenses, parking fees were charged to students, faculty, staff members, employees and some visitors using the facilities. It can be said that the fees charged are incidental to the proper operation of the parking facilities. The parking fees are very nominal and when a yearly permit is obtained, average from ten to twelve cents per day. As set out above, the operation runs at a substantial loss. It is abundantly clear from the record that there are no commercial aspects to this operation.

The parking facilities in question are essential and integral parts of the appellant institutions, they afford the students and faculty who must travel to its institutions in automobiles a safe and relatively contiguous space to park. The parking facilities also afford more adequate spaces for visitors to park. Most certainly the visitors of patients in the hospital are of some therapeutic value to the patients. It must be concluded that these parking facilities further the charitable purposes of the institutions.

Appellee cites the cases of *In re Application for Exemption of Real Property from Taxation: City of Columbus* v. *County of Franklin*, 167 Ohio St., 256, 147 N. E. (2d), 625, and *City of Cleveland* v. *Carney, Aud.*, 168 Ohio St., 305, 154 N. E. (2d), 752. In the former case the City of Columbus made application to exempt certain real property used for off-street

parking from taxation by virtue of Section 5709.08, Revised Code, which exempts "public property used exclusively for a public purpose" from taxation. The court held, in upholding the Board of Tax Appeals' denial of the exemption, that Section 717.05, Revised Code, which empowers municipal corporations to establish off-street parking facilities and provides that real estate acquired under that section shall not be tax exempt "must be considered *in pari materia* with Section 5709.08, Revised Code, and real property acquired and used by a municipality for off-street parking purposes is not exempt from taxation, * * *." In the latter case the Supreme Court upheld the decision of the Board of Tax Appeals in dismissing an application for exemption, by virtue of Section 5709.08, Revised Code, of a four acre tract of land, located at the airport owned by the City of Cleveland, which was leased to a private corporation for its own private purpose and profit whereby the city was to receive a percentage of the gross receipts as rental. In so doing the court relied primarily on authority of the former case. It is patent that these cases are not analogous.

The case of *The Benjamin Rose Institute* v. *Myers, Treas.*, 92 Ohio St., 238, 110 N. E., 929, is also cited. This case deals with real estate that is rented by a charitable institution for commercial and residential purposes solely to derive income and is clearly not applicable to the case at bar.

It is quite obvious that if fees were not charged for parking, we would not have free parking in an economic sense. The total expense would then have to be borne by the charitable institutions. We believe that logic dictates, under these circumstances, that the person directly benefited bear a portion of the cost for same.

A case in point is *Davis, Auditor* v. *The Cincinnati Camp Meeting Association*, 57 Ohio St., 257, 49 N. E., 401, wherein only the mode of transportation differentiates it from the present case, where it was held that:

"Where an association, organized and conducted for the purpose of a purely public charity, as a camp meeting, under the supervision and control of some church, owns real estate devoted exclusively to the same use; and thereon provides privileges for the comfort and convenience of those who may attend the meeting, the fact that it makes charges for the use

of these privileges, does not subject its property, nor the privileges so provided, to taxation under the laws of the state.''

Another analogous case is the California case of *The Church Divinity School of the Pacific* v. *County of Alameda*, 152 Cal. App. (2d), 496, 314 P. (2d), 209, which was a case brought under a constitutional provision imposing a like standard of exclusive use as contained in the Ohio Constitution and statute.

In that case a lot contiguous to the campus of the school was used as a parking lot for students, faculty and staff. A charge of $1.50 a month was made for the use of the lot. In exempting the property from taxation, the court held:

''* * * we conclude that property 'used exclusively for * * * purposes of education' includes any facilities which are reasonably necessary for the fulfillment of a generally recognized function of a complete modern college.''

The Supreme Court has repeatedly held that income received from property owned by charitable institutions as a part of their operation should be exempted from taxation. See *The American Humanist Association, Inc.* v. *Board of Tax Appeals*, 174 Ohio St., 545, 190 N. E. (2d), 685; *Goldman, a Taxpayer* v. *The Friars Club, Inc.*, 158 Ohio St., 185, 107 N. E. (2d), 518; *The Hubbard Press* v. *Glander, Tax Commr.*, 156 Ohio St., 170, 101 N. E. (2d), 382; *O'Brien, Treasurer* v. *The Physicians Hospital Association*, 96 Ohio St., 1, 116 N. E., 975.

The Supreme Court in *City of Cleveland* v. *Carney*, 172 Ohio St., 189, 174 N. E. (2d), 254, exempted the underground parking area adjacent to the Public Auditorium from taxation on the basis that it was ''public property used exclusively for a public purpose'' within the meaning of Section 5709.08, Revised Code. The importance of this case is that this was done even though the underground parking area was, at times, used as a public parking lot in no way connected with the operation of the Public Auditorium. The court held that the parking use of the property was ''a small incidental part of the overall use, insufficient to destroy the tax-exempt character of a facility which in the main is used exclusively for a public purpose.''

The test whether property should be accorded a tax-exempt status is the present use of the property rather than the ulti-

mate use of proceeds received from the property sought to be exempted. In the instant case, we have charitably used property producing income and not property whose sole purpose is to derive income, even though the income is used solely for charitable purposes. We conclude that the parking facilities in question are an essential and integral part of the charitable institutions exclusively used to carry on their functions, and the use is in no way commercial. The fees charged to students, faculty, staff members, employees and some visitors are used to offset some of the expense of providing the facilities and are incidental to the proper operation of same. We, therefore, determine and hold that the property in question, used for parking facilities, is property used exclusively for charitable purposes within the meaning of Section 5709.12, Revised Code, and the decision of the Board of Tax Appeals is reversed as being unreasonable and contrary to law, and final judgment is rendered for appellants.

In view of our holding as to assignment of error No. 1, we do not deem it necessary to discuss assignment of error No. 2.

Decision reversed.

KOVACHY, P. J., CORRIGAN, J., concur.